## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| **STEPHEN M. HARMER** | **: CIVIL ACTION** |
| | : |
| **v.** | **: NO. 18-175** |
| | : |
| **MARK CAPOZZA,** *et al.* | : |

## **MEMORANDUM**

**KEARNEY, J.**                                                                                    **August 29, 2019**

A felon seeking *habeas* relief from a state court life sentence by challenging his trial counsel's undisclosed former representation of a co-defendant almost a year earlier in the same prosecution must show his trial counsel operated under a conflict of interest constituting ineffective assistance of counsel. While prudent lawyering should disclose an earlier representation of a co-defendant arising from charges relating to the same alleged joint conduct, the failure to do so does not automatically render trial counsel constitutionally ineffective under the Sixth Amendment. The convicted felon must show his trial counsel who admittedly represented a co-defendant in the same case long before the trial did not pursue a viable alternative defense strategy or tactic and this viable alternative defense either inherently conflicted with, or was not undertaken due to, the trial counsel's other loyalties or interests. By way of one example, a trial counsel failing to adduce testimony which would adversely affect the former client's liberty interests at trial may allow *habeas* relief. But we do not today face this type of inherent conflict. After independent review of the convicted felon's challenges to alleged undisclosed conflicts by his trial counsel affecting five trial strategies, including our study of his counselled Objections to Judge Rice's exhaustive Report and Recommendation issued after two evidentiary hearings, we find the convicted felon does not state grounds for *habeas* relief.

## I.       Facts adduced from evidentiary hearings and public record.

Stephen Harmer, along with brothers Cody and Kyle Wunder, devised a plan to rob Douglas Herr's Lancaster County home after learning Mr. Herr kept a large sum of money in his bedroom safe.[1]  On August 17, 2012, the three men left a Lancaster bar and drove to Mr. Herr's home.[2]  They parked near the home; Mr. Harmer stayed in the truck while the Wunder brothers—armed with a shotgun, sledgehammer, and pry bar—broke into the house.[3]  According to Cody Wunder: once inside Mr. Herr's house, the brothers encountered Mr. Herr in a hallway and Kyle struck him in the head with his shotgun;[4]  the brothers believed this blow knocked Mr. Herr "out cold;"[5] the brothers then headed for the money in the bedroom safe;[6]  Mr. Herr reemerged with a rifle and shot Cody in the leg;[7]  Cody then directed his brother Kyle to shoot Mr. Herr;[8]  Kyle shot Mr. Herr in the head with his shotgun and killed him;[9] and the three men left the scene with approximately $200,000.[10]

### *Initial hearings with counsel.*

The police arrested Mr. Harmer and the Wunder brothers and charged them with murder, burglary, robbery, conspiracy, and other offenses.[11]  On September 6, 2012, the state court appointed Attorney Christopher Lyden to represent Cody Wunder.[12]  Mr. Harmer retained Attorney Mark Walmer.  Attorney Walmer represented Mr. Harmer during a September 2012 interview with the district attorney.  The district attorney believed Mr. Harmer provided self-serving statements and decided the only plea offer would involve life sentence without parole.[13]

While Attorney Walmer represented Mr. Harmer, Attorney Lyden billed 1.5 hours to the county for work on Cody Wunder's case.[14]  Attorney Lyden only spent parts of two days working on Cody Wunder's case. On September 10, Attorney Lyden made two calls and reviewed documents and a letter.[15]  On September 26, Attorney Lyden made two additional calls and performed research.[16]  There is no evidence of time spent talking with any defendant.[17]  Attorney

2

Lyden denied contacting Cody Wunder or his family.[18] On or before October 3, 2012, Cody Wunder's family retained Attorney Cory J. Miller to replace Attorney Lyden as his counsel before the October 5, 2012 preliminary hearing.[19] Attorney Lyden did not appear for Cody Wunder at the preliminary hearing.[20]

### *Mr. Harmer then retains Attorney Lyden without knowing of his earlier representation.*

At some point in October 2012, Mr. Harmer's family contacted Attorney Lyden and then retained him after meeting Mr. Harmer in the prison.[21] Attorney Lyden visited Mr. Harmer in jail "about a dozen" times in October 2012.[22]   Mr. Harmer and Attorney Lyden offered conflicting testimony on whether Attorney Lyden ever told Mr. Harmer about his prior representation of Cody Wunder.[23] Mr. Harmer insists Attorney Lyden did not tell him he previously represented Cody Wunder in the same case and would not have hired him had he known.[24] Attorney Lyden testified he talked to Mr. Harmer about his prior representation of Cody Wunder in December 2012.[25] While the testimony conflicts, Judge Rice did not find Attorney Lyden credible and found Attorney Lyden did not reveal to Mr. Harmer his earlier representation of Cody Wunder.[26]  Judge Rice explained "Lyden first mentioned his disclosure to Harmer at the February 2019 evidentiary hearing and failed to include this important fact in an earlier sworn declaration describing his representation of Cody. Lyden also failed to take any notes during any of his multiple meetings with Harmer, including the session where he purportedly disclosed his representation of Cody."[27]

Approximately nine months after Attorney Lyden ended his short-term representation of Cody Wunder, the Wunder brothers, then advised by new counsel, pled guilty in July 2013.[28] As it decided after Mr. Harmer's allegedly inaccurate interview, the Commonwealth agreed it would not seek the death penalty for Kyle Wunder.[29] Cody Wunder also agreed to cooperate against Mr. Harmer.

3

## *Attorney Lyden's trial and appeal strategies.*

Mr. Harmer went to trial in August 5-12, 2013 with Attorney Lyden as trial counsel.[30] At trial, Attorney Lyden defended Mr. Harmer's innocence on the murder charge by arguing the Wunder brothers did not murder Mr. Herr in furtherance of the robbery or burglary.[31] The Commonwealth called fifteen witnesses.[32] The Commonwealth called Cody Wunder who testified Kyle Wunder killed Mr. Herr while the two were in the home attempting to steal the money.[33] Attorney Lyden impeached Cody Wunder about the Commonwealth offering him a guilty plea of second rather than first degree murder even though he directed his brother to shoot Mr. Herr.[34] Attorney Lyden also cross-examined Cody Wunder about his mental state after being shot and lying to police on the cause of his gunshot wound.[35]

The Commonwealth called Mr. Harmer's neighbor and friend, Montana Leimseider. Ms. Leimseider testified Mr. Harmer told her about the plan to rob Mr. Herr before the robbery took place; she "remember[ed] that [Mr. Harmer] was planning to scare [Mr. Herr] with a gun" but Mr. Harmer "didn't want anyone home" during the robbery.[36] Attorney Lyden impeached Ms. Leimseider about her significant drug use and her potential charges for heroin dealing.[37] The Commonwealth also called Mr. Harmer's girlfriend, Rebecca Hensel. On direct examination by the Commonwealth, Ms. Hensel testified to observing Mr. Harmer's shock after the incident; Mr. Harmer told her he did not expect anyone to be killed.[38] Attorney Lyden did not cross-examine Ms. Hensel and instead called Ms. Hensel as a defense witness where she testified overhearing Kyle Wunder state he "didn't mean for this to happen. What was I supposed to do? He shot my brother."[39]

Attorney Lyden called Kyle Wunder as the first defense witness.[40] Kyle Wunder asserted his Fifth Amendment right against self-incrimination and did not testify.[41] Attorney Lyden

4

introduced Kyle Wunder's September 2012 videotaped police statement.[42] According to Kyle Wunder's statement: Kyle and Cody Wunder left Mr. Herr's home with the lock boxes; Cody Wunder collapsed on Mr. Herr's porch and realized Mr. Herr shot him; Cody Wunder then directed his brother to go back inside to shoot Mr. Herr.[43]

Attorney Lyden's case strategy "was [not] that some co-defendant was shifting the blame."[44] In his closing, Attorney Lyden told the jury to believe Kyle's account because he "completed the deadly act himself" and questioned Cody Wunder's ability to accurately recall the event because of the gunshot wound.[45] Attorney Lyden contended the murder "was an act of retaliation, it was done out of anger and totally unnecessary to completing this crime."[46] Attorney Lyden—relying on Kyle Wunder's statement and other evidence suggesting Mr. Harmer did not intend for Mr. Herr to be murdered—did not present a character witness about Mr. Harmer's nonviolent tendencies. Attorney Lyden also did not request an accomplice credibility instruction about Cody Wunder. Attorney Lyden believed the case ultimately would be decided on whether the jury believed the story of Cody or Kyle Wunder.

The jury found Mr. Harmer guilty of second-degree murder, robbery, criminal conspiracy to commit robbery, burglary, and criminal conspiracy to commit burglary.[47] The court sentenced Mr. Harmer to life incarceration plus five to ten years, with no possibility of parole.[48] Attorney Lyden filed an appeal. In July 2014, the Pennsylvania Superior Court affirmed Mr. Harmer's conviction.[49] Attorney Lyden, along with co-counsel, sought allocatur but the Pennsylvania Supreme Court denied review.[50]

### *Mr. Harmer seeks post-conviction relief without raising the conflict issue.*

On January 7, 2016, Mr. Harmer *pro se* petitioned for collateral review under Pennsylvania's Post-Conviction Relief Act alleging ineffective assistance of trial counsel Lyden

5

on five grounds.[51] The court appointed Randall Miller as Mr. Harmer's PCRA counsel on January 11, 2016.[52] Mr. Harmer did not raise the conflict as Attorney Miller did not discover the conflict. He later testified he found it "so unusual" for a lawyer to represent "one co-defendant in a criminal homicide, robbery, burglary and criminal conspiracy case and then subsequently represent another co-defendant, in that same series of events, as in this case."[53] Following a hearing, the PCRA court dismissed Mr. Harmer's petition.[54] Mr. Harmer appealed the dismissal to the Pennsylvania Superior Court. In June 2017, the Pennsylvania Superior Court affirmed dismissal of the PCRA suit.[55] The Pennsylvania Supreme Court denied review.[56]

### *Mr. Harmer petitions for habeas relief.*

In January 2018, Mr. Harmer *pro se* petitioned for a writ of *habeas corpus* under 28 U.S.C. § 2254.[57] A month later, Mr. Harmer supplemented his *habeas* petition raising new counselled claims not asserted in his *pro se* PCRA petition.[58] In a new counselled claim, Mr. Harmer argued his trial counsel, Attorney Lyden, "labored under an actual conflict of interest that was never disclosed to Harmer and adversely affected his representation of Harmer" due to "trial counsel's prior representation of original co-defendant and eventual Commonwealth witness Cody Wunder."[59]

We referred Mr. Harmer's petition to Judge Timothy R. Rice for a Report and Recommendation.[60] Judge Rice held two hearings on Mr. Harmer's new conflict of interest claim.[61] Judge Rice heard testimony from Elizabeth Libby, Randall Miller, Susan Ford, Stephen Harmer, and Christopher Lyden.[62] Judge Rice then issued a detailed Report and Recommendation recommending we deny Mr. Harmer's *habeas* petition.[63]

Mr. Harmer now objects to Judge Rice's Report and Recommendation solely based on Judge Rice's findings on his conflict of interest claim.[64] Mr. Harmer specifically objects to Judge

6

Rice's analysis focusing on one aspect of the governing test based on causation but not considering an inherent conflict. We agree with Judge Rice in denying and dismissing the *habeas* petition but for slightly different reasons; we find no viable alternative strategy on three of the challenged grounds and, even if two of the alternative strategies are viable, Mr. Harmer cannot show either causation or inherent conflict.

## II. Analysis.

Mr. Harmer argues Judge Rice erred in the Report and Recommendation by requiring Mr. Harmer prove Attorney Lyden bypassed several viable alternative strategies "because of" or "due to" loyalties to Cory Wunder when Mr. Harmer must only show these alternatives presented an inherent conflict for Attorney Lyden. We grant the objections in part to the extent Judge Rice limited the analysis to the "because of" element without analyzing a possible inherent conflict. After *de novo* review and study of Mr. Harmer's objections, we find no basis for *habeas* relief. We agree with the remainder of Judge Rice's Report and Recommendation. We deny and dismiss Mr. Harmer's Petition but find limited grounds to issue a certificate of appealability.

### A. We overrule Mr. Harmer's Objections to Judge Rice's Report and Recommendation.

Mr. Harmer argues Judge Rice incorrectly applied our Court of Appeals' standard for determining whether an actual conflict of interest exists. We first review the legal standard for a conflict of interest allowing *habeas* relief.

The Sixth Amendment guarantees a criminal defendant "shall . . . have the Assistance of Counsel for his defense."[65] "This right is accorded . . . 'not for its own stake, but because of the effect [counsel] has on the ability of the accused to receive a fair trial.'"[66] A convicted criminal defendant who feels his counsel failed to preserve the fairness of his trial may challenge his conviction on grounds of ineffective assistance of counsel.[67] To succeed on an ineffective

7

assistance of counsel claim under *Strickland*, a criminal defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[68] "Surmounting *Strickland*'s high bar is never an easy task."[69]

The Court has nonetheless developed exceptions to *Strickland*'s "high bar."[70] For instance, a criminal defendant claiming his lawyer labored under a conflict of interest is not governed by *Strickland* and instead is governed by the Court's Sixth Amendment conflict of interest precedent.

The type of alleged conflict is an important distinction. Several courts of appeals apply a separate standard for successive, rather than concurrent, representation cases.[71] Our Court of Appeals does not appear to have faced this issue yet. The Court of Appeals for the Fifth Circuit observed: "in a case of successive representation, both the temporal and substantive relationship between the two representations may be quite remote."[72] The Supreme Court in *Mickens* acknowledged "[b]oth [*Cuyler*] and *Holloway* stressed the high probability of prejudice arising from multiple concurrent representation" before directing: "[n]ot all attorney conflicts present comparable difficulties."[73] The Court in *Mickens* recognized even the Federal Rules of Criminal Procedure "treat concurrent representation and prior representation differently, requiring a trial court to inquire into the likelihood of conflict whenever jointly charged defendants are represented by a single attorney, but not when counsel previously represented another defendant in a substantially related matter, even where the trial court is aware of the prior representation."[74]

As Mr. Harmer argues his conviction should be reversed because of Attorney Lyden's conflict arising from the undisclosed successive representation in the same criminal prosecution, we now review the Court's conflict of interest precedents for successive representations.

8

## 1. What standard applies in successive representations?

In *Holloway v. Arkansas*, [75] the Supreme Court considered whether a court appointed public defender who the court required, over the lawyer's objection, to represent three co-defendants with conflicting interests violated the criminal defendant's Sixth Amendment right to effective counsel. The Supreme Court found the conflict "which [the defendant] and his counsel tried to avoid by timely objections to the joint representation" undermined the adversarial process.[76] The Court held a conviction obtained after a trial court refuses inquiry into an objection about a lawyer's conflicting representation must be automatically reversed.[77] In reaching this ruling, the Court reaffirmed multiple representation does not *per se* violate the Sixth Amendment and restricted its automatic reversal rule to when a conflict of interest objection is raised and not adequately heard by the trial judge.

Two years later, in *Cuyler v. Sullivan*,[78] the Supreme Court considered whether a defendant's knowing and voluntary retention of conflicted counsel violated the Sixth Amendment. The criminal defendant in *Cuyler* knowingly hired the same attorneys as two men charged in his same murder. Neither the defendant nor his counsel objected to the representation. The jury found the defendant guilty. After direct appeal, the defendant filed a writ of *habeas corpus* arguing his counsel improperly labored under a conflict of interest due to his representation of the other charged murder defendants. The Supreme Court considered this case different from *Holloway* because the defendant did not raise a formal trial objection to the representation. The Court ruled the trial court held no duty to inspect the conflict without objection and "a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel."[79] Instead of presuming ineffective assistance, the Court held a criminal defendant "who raised no objection

9

at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."[80]

About twenty years later, in *Mickens v. Taylor*, [81] the Supreme Court considered whether to grant automatic reversal to a convicted criminal defendant who, like Mr. Harmer, did not know of the conflict arising from his lawyer's earlier representation but the judge should have realized and alerted the defendant to the attorney's conflict. In *Mickens,* the Commonwealth of Virginia charged a criminal defendant with murder of a teenage boy facing criminal assault charges at the time of his death. The Commonwealth assigned the criminal murder defendant the same counsel who represented the teenage victim in his criminal assault case. The assigned counsel did not tell his client he represented the teenage victim.[82] The judge, who oversaw both the murder case and the teenager's assault case, did not alert the criminal defendant of the lawyer's conflict. The jury found the defendant guilty. The defendant did not learn of his trial counsel's earlier representation of the victim until he filed for *habeas* relief.[83] The defendant argued for automatic reversal because he had no opportunity to object to his conflicted counsel and the trial judge knew about the lawyer's earlier representation.

The Supreme Court refused to grant automatic reversal to the defendant even when the defendant never had a chance to waive his lawyer's prior conflict of interest.[84] Justice Scalia, writing for the majority, explained "[p]etitioner's proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the [*Cuyler*]-mandated inquiry, makes little policy sense."[85] He reasoned: "the rule applied when the trial judge is not aware of the conflict (and thus not obligated to inquire) is that prejudice will be presumed only if the conflict has significantly affected counsel's performance—thereby rendering

the verdict unreliable, even though *Strickland* prejudice cannot be shown."[86] The Court held *Cuyler* applied.[87] It found the defendant did not meet his burden under *Cuyler*.

The Supreme Court's holding in *Mickens* differs from our analysis because the defense counsel earlier represented the assault victim and not a co-defendant. Mr. Harmer argues Attorney Lyden labored under a conflict of interest based on his earlier representation of Cody Wunder in the same criminal prosecution. Mr. Harmer insists Attorney Lyden did not tell him he previously represented Cody Wunder in the same case and would not have hired him had he known.[88] Mr. Harmer does not claim he or Attorney Lyden raised an objection to the conflict at trial. Because there is no trial objection, *Holloway* does not apply.

Attorney Lyden's representation of Mr. Harmer after briefly representing Cody Wunder is a successive representation. This conflict is like *Mickens* because Mr. Harmer claims he did not know about the earlier representation during his trial. In *Mickens*, the Supreme Court rejected adopting a new rule of automatic reversal and applied *Cuyler*. This case is unlike *Mickens* because defense counsel earlier represented the victim, not the co-defendant as we have today. It is difficult to predict whether trial counsel would be more likely to protect the interests of an earlier client who is a victim of the present client rather than a co-defendant of the present client. We may find a greater concern with a former client who is the victim. The interests more directly diverge. But even in the victim context, the Supreme Court directs in *Mickens* we should not issue *habeas* relief by finding a conflict automatically requires a new trial or release from the sentence; we also apply *Cuyler*.

## 2. Is there an inherent conflict?

We now analyze the standard applying to Mr. Harmer's conflict of interest claim arising from the successive representation of two men charged for the same criminal conduct as neither

11

shot Mr. Herr but both are arguably accomplices. It is practice within our Court of Appeals to review any *habeas* conflict of interest claim under *Cuyler*.[89] To succeed under *Cuyler*, Mr. Harmer must prove "an actual conflict of interest adversely affected his lawyer's performance."[90] An actual conflict "is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action."[91] Mr. Harmer must show an actual conflict between his duties to his former client and his duties to Mr. Harmer.[92] Our Court of Appeals in *Gambino* directs a two-part test when determining whether a *habeas* petitioner is entitled to relief based upon his lawyer's alleged conflict of interest:

- First, [the petitioner] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative.

- Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.[93]

Judge Rice found Mr. Harmer made a *prima facie* case of an actual conflict of interest and properly ordered an evidentiary hearing.[94] After evaluating the credibility of witnesses, Judge Rice then found Mr. Harmer did not meet the *Gambino* standard.[95] Mr. Harmer agrees Judge Rice properly invoked *Gambino*. He objects to Judge Rice only considering whether Attorney Lyden did not present an alternative defense "due to" or "because of" his loyalties or interests to Cody Wunder.[96] In other words, Mr. Harmer argues Judge Rice unfairly required Mr. Harmer to establish evidence demonstrating Attorney Lyden did not pursue a strategy because he consciously understood a conflict of interest with Cody Wunder.[97] Mr. Harmer argues the second element of *Gambino* only requires he prove a viable alternative strategy presented an inherent conflict for

Attorney Lyden to pursue based upon his continuing obligation to Cody Wunder and does not require a showing of actual causation.[98] We agree.

To understand Attorney Lyden's inherent conflict argument, we must understand Attorney Lyden's loyalties and interests to Cody Wunder several months after his representation ended. Counsel does not address, and we are not aware of case law, defining actual conflict with former clients. We are instructed by our Court of Appeals and the decisions of other courts of appeals to review the Rules of Professional Conduct to understand Attorney Lyden's loyalties and interests to Cody Wunder.[99] The Pennsylvania Rules of Professional Conduct applying to Attorney Lyden determine a lawyer's continuing obligations to a former client:

### Rule 1.9. Duties to Former Clients

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

[...]

Comment (1)    After termination of a client-lawyer relationship, a lawyer has certain continuing duties with respect to confidentiality and conflicts of interest and thus may not represent another client except in conformity with this Rule.[100]

Under Rule 1.9, Attorney Lyden owes Cody Wunder two continuing duties: (1) a duty not to represent a different and materially adverse client in the same or similar action without consent; and, (2) a duty of confidentiality.

The first of these duties is not relevant. This duty required Attorney Lyden to obtain Cody Wunder's informed consent before accepting the representation of Mr. Harmer. Obtaining informed consent requires Attorney Lyden to "mak[e] all reasonable and necessary disclosures to the former client and, where appropriate, advis[e] the former client to seek independent legal

13

advice as to whether to provide the requested informed consent or not."[101] The rule is designed to protect the former client. Attorney Lyden's obligation to Cody Wunder regarding consent does not limit Attorney Lyden's trial and appellate strategies while representing Mr. Harmer.

The second of these duties warrants further study. Potential conflicts between Attorney Lyden's elected trial strategies and his duty to Cody Wunder are more fully evaluated by reviewing Attorney Lyden's duty of confidentiality. The Pennsylvania Rules of Professional Conduct instruct us on Attorney Lyden's duty of confidentiality: "[a] lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c)."[102] Attorney Lyden's duty of confidentiality to Cody Wunder involves protecting the confidentiality of information he received during his one-and-a-half hour representation of Cody Wunder.

Mr. Harmer's counselled supplemental petition identifies five potential alternative trial strategies Attorney Lyden could have employed but did not because of an "inherent conflict" between the viable strategies and Attorney Lyden's loyalty to Cody Wunder.[103] We disagree. We reviewed the five potential strategies and find each fails to meet the *Gambino* test. We overrule Mr. Harmer's Objections and accept Judge Rice's Recommendation to dismiss Mr. Harmer's Petition.

### 3. Mr. Harmer fails to show pursuit of a plea agreement presented a viable alternative strategy.

Mr. Harmer argues Attorney Lyden's failure to pursue a plea agreement for Mr. Harmer presented an inherent conflict with his loyalty to Cody Wunder. But Judge Rice found pursuing a plea agreement would not have been a viable strategy. As Judge Rice proved after an evidentiary hearing, the Commonwealth would not offer Mr. Harmer anything less than a life sentence without

14

parole: "Harmer fails to establish that Lyden's prior representation of Cody caused him not to actively pursue a plea agreement for Harmer. Lyden could not have secured a more favorable plea for Harmer because the Commonwealth was uninterested in offering Harmer anything but a life sentence without parole."[104]

Based upon the Commonwealth's unwillingness to offer a plea to Mr. Harmer, Mr. Harmer fails to show Attorney Lyden could pursue a viable alternative strategy in his negotiating a potential plea for Mr. Harmer.[105] Attorney Lyden could not obtain a plea not considered by the Commonwealth. There is no basis to find the Commonwealth offered a plea. There is no basis to find Attorney Lyden could have offered a plea. This futile strategy is not viable. This argument does not meet the first *Gambino* test.[106] We agree with Judge Rice.

**4. A more vigorous pursuit of an appeal did not present a viable alternative.**

Mr. Harmer argues Attorney Lyden could have more vigorously pursued his appeal and his failure to do so arises from an inherent conflict with Attorney Lyden's loyalties to Cody Wunder. Attorney Lyden appealed to the Pennsylvania Superior Court and sought allocatur from the Pennsylvania Supreme Court. Neither appellate court found merit in the appeal.

Mr. Harmer still argues if Attorney Lyden vigorously litigated his appeal, and if the Pennsylvania Superior Court reversed his conviction, Cody Wunder may have obtained a commutation of his sentence if a court released Mr. Harmer following reversal. This argument is too tenuous. There is no basis to find Attorney Lyden could have done more on the appeal. We cannot find a viable strategy which requires we assume a more vigorous appeal would result in Mr. Harmer's release. Attorney Lyden pursued the appeal. Mr. Harmer does not present a "viable alternative strategy" by stating Attorney Lyden should have more "aggressive[ly]" pursued the appeal.[107] We agree with Judge Rice.[108]

15

### 5. Mr. Harmer fails to show thorough cross-examination of witnesses is a viable alternative strategy or that Attorney Lyden's loyalty to Cody Wunder is in inherent conflict with this alternative strategy.

Mr. Harmer argues a thorough cross examination of several witnesses would have assisted his defense and this failure highlights an inherent conflict with Attorney Lyden's loyalty to Cody Wunder. Mr. Harmer argues Attorney Lyden only cross-examined four of fifteen Commonwealth witnesses, which Mr. Harmer argues alone confirms adverse effect. [109] But we cannot assess such a broad alternative strategy and determine its viability or whether such a strategy inherently conflicts with Attorney Lyden's continuing obligations to Cody Wunder. This argument fails.

Mr. Harmer argues three specific instances where Attorney Lyden should have conducted a more thorough cross-examination. Mr. Harmer cites Attorney Lyden's decision to not cross-examine Commonwealth witness Rebecca Hensel. Judge Rice found Attorney Lyden did not cross-examine Ms. Hensel but instead called Ms. Hensel as a defense witness; on direct examination as a defense witness, Ms. Hensel testified to the information Mr. Harmer sought to adduce on cross examination.[110] In other words, Mr. Harmer's proposed alternative strategy of a more vigorous cross-examination did not present a viable alternative strategy because the jury heard the information.[111] We again agree with Judge Rice. The evidence reached the jury. More cumulative cross-examination on evidence is not viable. Mr. Harmer then argues Attorney Lyden failed to thoroughly cross-examine Commonwealth witness Rebecca Leimseider. Judge Rice found this argument fails because (1) Attorney Lyden extensively impeached Ms. Leimseider about her drug use; and, (2) Ms. Leimsider testified to the requested testimony on direct examination by the Commonwealth.[112] We have no basis to find a relationship with Cody Wunder limited Attorney Lyden's examination of these two witnesses.[113] We agree with Judge Rice.

16

Lastly, Mr. Harmer argues Attorney Lyden's continuing duty to Cody Wunder prevented a more thorough cross-examination of Cody Wunder when called by the prosecution. Mr. Harmer argues we must "conclusively presume" Attorney Lyden "received privileged information during his prior representation of [Cody Wunder] regardless of the length of that representation."[114] It is unclear whether we apply this presumption in conducting a *Gambino* analysis. Courts apply this presumption when considering a criminal defendant's waiver of his lawyer's conflict of interest.[115] Even if we apply the presumption, Mr. Harmer's argument fails. Reviewing Attorney Lyden's cross-examination of Cody Wunder, we find no viable alternative strategy. Attorney Lyden impeached Cody Wunder about the Commonwealth offering him a guilty plea of second rather than first degree murder even though he directed his brother to shoot Mr. Herr.[116] Attorney Lyden also cross-examined Cody Wunder about his mental state after being shot and lying to police about the cause of his gunshot wound.[117] We do not see other viable grounds for cross-examination of Cody Wunder. Mr. Harmer offers none. We agree with Judge Rice as to the lack of a viable alternative strategy on the cross-examinations.

### 6. Failure to present evidence of Mr. Harmer's nonviolent character did not present an inherent conflict with Attorney Lyden's loyalty to Cody Wunder.

Mr. Harmer argues Attorney Lyden's unwillingness to present Mr. Harmer's nonviolent character presented an inherent conflict with his loyalty to Cody Wunder. Presenting evidence of nonviolent character is a viable alternative strategy. We now turn to *Gambino*'s second test.

While we find presenting a nonviolent character witness to be a viable alternative strategy, we find no inherent conflict between not pursuing this strategy and Attorney Lyden's duty to Cody Wunder. His loyalty does not extend this far. Attorney Lyden is only limited by his duty of confidentiality to Cody Wunder. We cannot see how this strategy would be evidence of an actual conflict based on confidentiality. Even assuming Cody Wunder discussed Mr. Harmer's violent

17

character during the brief time Attorney Lyden represented him, Attorney Lyden could still have located a different witness to testify to Mr. Harmer's nonviolent character. We see no reason Attorney Lyden would be inherently conflicted from presenting this trial strategy based upon his continuing duty of confidentiality to Cody Wunder.

We also agree with Judge Rice's reasoning Attorney Lyden did not present this evidence "because of" his conflicting loyalties.[118] Judge Rice explained Attorney Lyden depicted Mr. Harmer as nonviolent throughout the trial: "Lyden consistently emphasized Cody's and Kyle's violent nature, calling them 'a couple cold-blooded killers.' He contrasted them with Harmer, who 'did not participate in any way in the decision to kill [Herr].'"[119] This viable alternative strategy fails the *Gambino* second test.

### 7. Failure to request an accomplice liability instruction did not present an inherent conflict with Attorney Lyden's loyalty to Cody Wunder.

Mr. Harmer argues Attorney Lyden's failure to request an accomplice liability instruction explaining Cody Wunder's involvement in the crime presented an inherent conflict with Attorney Lyden's loyalty to former client. We agree with Mr. Harmer requesting an accomplice liability instruction is a viable alternative strategy. We turn to *Gambino*'s second test.

While a viable alternative, we are mindful both Cody Wunder and Mr. Harmer are arguably accomplices. Cody Wunder's brother fatally shot Mr. Herr. There is no conflict in the relative legal culpability of Cody Wunder and Mr. Harmer. Attorney Lyden's loyalty to Cody Wunder does not extend so far to warrant a finding of inherent conflict. Attorney Lyden only owed Cody Wunder a duty of confidentiality. This duty would not conflict with Attorney Lyden's ability to request an accomplice liability instruction. Weeks before Mr. Harmer's trial, Cody Wunder (represented by his Attorney Miller for the past several months) accepted a plea deal. Attorney Lyden impeached Cody Wunder on accepting the plea for second degree murder when originally

18

charged with first degree murder.[120] There is no conceivable confidential communication limiting Attorney Lyden's ability to employ this trial strategy of requesting an accomplice instruction. Both of his clients would have enjoyed the accomplice liability instruction. We overrule Mr. Harmer's objection.

## B. We incorporate the remainder of Judge Rice's Report and Recommendation.

Mr. Harmer does not object to Judge Rice's findings regarding Mr. Harmer's felony murder instruction due process argument or his cumulative trial counsel error argument.[121] We agree with Judge Rice's findings and recommendation on those challenges.

## C. We grant a certificate of appealability.

"Unless a circuit justice or judge issue a certificate of appealability, an appeal may not be taken to the court of appeals from ... the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court.[122] When a district court rejects constitutional claims on the merits, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[123]

After careful consideration of the state court record and two evidentiary hearings in this Court, we find Mr. Harmer has not shown a basis for *habeas* relief after finding we must apply *Cuyler* and *Gambino*. But neither of those cases involved undisclosed successive representation of co-defendants in the same criminal prosecution.[124] Trial strategies may differ based on whether the earlier client is the victim or a co-defendant. We do not see evidence of ineffective counsel by Attorney Lyden. But we remain bothered by Attorney Lyden's apparent failure to disclose the earlier representation to Mr. Harmer and obtain his consent. We cannot imagine why a lawyer would not disclose this fact. He read the file and knew the case. Mr. Harmer's family contacted Attorney Lyden apparently after he stopped representing Cody Wunder. The testimony conflicts but Judge Rice found Attorney Lyden never mentioned his earlier role.

19

Under the present actual conflict rule, we find no inherent conflict under *Cuyler v. Sullivan*.[125] *Cuyler* involved a disclosed earlier representation and effective knowledge of the earlier representation. *Mickens* involved an earlier representation but of a victim and not a co-defendant. We are not aware of authority, and counsel offer none, involving successive representation of co-defendants in the same criminal case. While we read *Mickens* to apply *Cuyler* and not automatically find ineffective assistance, we cannot find Mr. Harmer's claims as to Attorney Lyden's conduct are not debatable in this specific context. We grant a certificate of appealability.

## III. Conclusion.

In the accompanying Order, we overrule Mr. Harmer's objections in part and grant the objections in part but find granting the objections in part does not warrant granting the petition. We adopt Judge Rice's Report and Recommendation in part. We deny and dismiss Mr. Harmer's Petition for a writ of *habeas corpus*. We issue a certificate of appealability.

---

[1] Record, Lancaster County Trial, N.T. C. Wunder, Aug. 8, 2013, at 474-82.

[2] *Id.* at 503-05.

[3] *Id.* at 488-89, 493-98.

[4] *Id.* at 521.

[5] *Id.* at 522.

[6] *Id.* at 523-25.

[7] *Id.* at 525-27.

[8] *Id.* at 526-27.

[9] *Id.*

20

[10] *Id.* at 548-49.

[11] ECF Doc. No. 25, p. 1-2 ¶ 2.

[12] ECF Doc. No. 34, at 155-56, 175, 177 (N.T. C. Lyden, Feb. 15, 2019).

[13] *Id.* at 63-64 (N.T. R. Miller, Feb. 15, 2019).

[14] *Id.* at 133-38 (N.T. C. Lyden, Feb. 15, 2019).

[15] *Id.* at 137.

[16] *Id.* at 138.

[17] *Id.* at 133-38.

[18] *Id.*

[19] ECF Doc. No. 25, p. 5 ¶ 24(d)-(e).

[20] *Id.*

[21] ECF Doc. No. 34, at 102-04 (N.T. S. Harmer, Feb. 15, 2019).

[22] *Id.* at 104.

[23] Attorney Lyden testified at the February 15, 2019 evidentiary hearing:

> Q:    So, when you discovered, in December of 2012, while you were representing Mr. Harmer, that you had been appointed counsel for Mr. Wunder, what did you do at that point?
>
> A:    I'm sorry.  Could you repeat that, please?
>
> Q:    In December 2012, when you discovered – when you received the information that had been filed in Cody Wunder's case, what did you do at that time, since you were already representing Stephen Harmer?
>
> Q:    Well, I – I talked to him about it.
>
> THE COURT:    Talked to who?
>
> A:    Mr. Harmer, about it.
>
> Q:    Can you provide us with a few more details about the context of the conversation?

21

A: Well, I said that the Court had appointed me, to – to – to his – to the co-defendant in the case. I said that I'd contacted bail and I arranged to have myself removed from the case and have another attorney, you know, another attorney assigned to the case.

I did tell him I didn't see any problem with me continuing to represent him, if he wanted me to continue to represent him. I did give him the option to have – to have, you know, to have me removed, if he wanted me to, but I didn't see a problem with me continuing with the case at that time.

Q: Why did you not see a problem with yourself continuing as counsel?

A: Well, I hadn't met the – Mr. Wunder. I didn't view him as a – former client. I didn't think there was an attorney-client relationship there. That was just the way I viewed it.

So, there wasn't anything that would prevent me from zealously representing Mr. Harmer, if he wanted me to continue.

ECF Doc. No. 35, at 128-29 (N.T. C. Lyden, Feb. 15, 2019). At this same evidentiary hearing, Mr. Harmer testified:

Q: In any of the times that the two of you met, or spoke, did he ever tell you that he had represented Cody Wunder?

A: Not once. That never came up.

Q: Did he ever discuss with you, waiving a conflict of interest?

A: I knew nothing of that. I didn't even know that was something that existed.

*Id.* at 104 (N.T. S. Harmer, Feb. 15, 2019).

[24] *Id.* at 102-04 (N.T. S. Harmer, Feb. 15, 2019).

[25] *Id.* at 128 (N.T. C. Lyden, Feb. 15, 2019).

[26] *See id.* at 102-04 (N.T. S. Harmer, Feb. 15, 2019); *id.* at 128 (N.T. C. Lyden, Feb. 15, 2019).

[27] ECF Doc. No. 40, at p. 4, fn. 1 (citations omitted).

[28] ECF Doc. No. 25 at p. 2 ¶ 7.

[29] *Id.* at p. 2-3 ¶ 8.

[30] *Commonwealth v. Harmer*, No. CP-36-CR-4640-2012 (Lancaster C.C.P. Sept. 1, 2016).

[31] *Id.*

[32] *See generally* Record, Lancaster County Trial, N.T., Aug. 6, 2013 (calling five witnesses); Record, Lancaster County Trial, N.T. Aug. 6, 2013 (calling four witnesses); Record, Lancaster County Trial, N.T. Aug. 8, 2013 (calling four witnesses); Record, Lancaster County Trial, N.T. Aug. 9, 2013 (calling two witnesses).

[33] Record, Lancaster County Trial, N.T. C. Wunder, Aug. 8, 2013, at 474-82.

[34] *Id.* at 560-72.

[35] *Id.* Cody Wunder told police he had been shot in a drug deal when taken to the hospital after being shot by Mr. Herr. *Id.* at 565-67.

[36] Record, Lancaster County Trial, N.T. M. Leimseider, Aug. 6, 2013, at 310.

[37] *Id.* at 314-20.

[38] Record, Lancaster County Trial, N.T. R. Hensel, Aug. 7, 2013, at 436, 438.

[39] Record, Lancaster County Trial, N.T. R. Hensel, Aug. 9, 2013, at 706.

[40] Record, Lancaster County Trial, N.T. K. Wunder, Aug. 9, 2013, at 696.

[41] *Id.* at 697.

[42] Record, Lancaster County Trial, N.T. P. Strosser, Aug. 9, 2013, at 703.

[43] *Commonwealth v. Harmer*, No. CP-36-CR-4640-2012 (Lancaster C.C.P. Sept. 1, 2016).

[44] Record, PCRA Hearing, N.T. C. Lyden, May 12, 2016, at 18.

[45] Record, Lancaster County Trial, N.T. Aug. 12, 2013, at 724-25.

[46] *Id.* at 726.

[47] ECF Doc. No. 25, p. 3 ¶ 9.

[48] *Id.* at p. 3 ¶ 10.

[49] *Id.* at p. 3 ¶ 14-15.

[50] *Id.* at p. 3 ¶ 16-17.

[51] *Id.* at p. 4 ¶ 18; *Commonwealth v. Harmer*, No. CP-36-CR-4640-2012 (Lancaster C.C.P. Sept. 1, 2016). Mr. Harmer contended he received ineffective counsel because his counsel failed to: (1)

request Jury Instruction (Criminal) 4.01 (the "accomplice credibility" instruction); (2) prevent or otherwise challenge evidence of his bad acts; (3) object to improper bolstering of Cody Wunder; (4) present witnesses to testify to his nonviolent character; and (5) object to hearsay statements made outside the scope of any conspiracy. *Id.* at p. 7.

[52] ECF Doc. No. 25, p. 4 ¶ 19.

[53] ECF Doc. No. 34, at 57 (N.T. R. Miller, Feb. 15, 2019).

[54] ECF Doc. No. 25, p. 4 ¶ 23.

[55] *Id.*

[56] *Id.*

[57] ECF Doc. No. 1.

[58] ECF Doc. No. 5; ECF Doc. No. 9.

[59] ECF Doc. No. 9. While Mr. Harmer failed to raise this claim in his PCRA petition, conceding a procedural default, Mr. Harmer argued Judge Rice should still review his claim because he could show cause for the default and prejudice from the failure to review. Judge Rice found Mr. Harmer showed cause. ECF Doc. No. 40, at p. 11. Mr. Harmer's PCRA counsel, Randall Miller, did not discover Attorney Lyden's conflict. ECF Doc. No. 34, at 57 (N.T. R. Miller, Feb. 15, 2019). Judge Rice also found Mr. Harmer sufficiently proved prejudice to excuse his default "because the [conflict] claim is substantial." ECF Doc. No. 40, at p. 12. We agree with Judge Rice's analysis.

[60] ECF Doc. No. 2.

[61] ECF Doc. No. 34.

[62] *Id.*

[63] ECF Doc. No. 40

[64] ECF Doc. No. 43.

[65] U.S. CONST. amend. VI.

[66] *Mickens v. Taylor*, 525 U.S. 162, 166 (2002) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)).

[67] *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984).

[68] *Id.*

[69] *Padilla v. Kentucky*, 559 U.S. 359, 371 (2010).

[70] *Id.*

24

[71] *See Smith v. White*, 815 F.2d 1401, 1405 (11th Cir. 1987), *cert. denied*, 484 U.S. 863 (1987) ("(1) [Where] counsel's earlier representation of the witness was substantially and particularly related to counsel's later representation of defendant, or (2) [where] counsel actually learned particular confidential information during the prior representation of the witness that was relevant to defendant's later case."); *see also Enoch v. Gramley*, 70 F.3d 1490 (7th Cir. 1995) ("[The Eleventh Circuit's] approach makes sense and we adopt this rationale."); *Maiden v. Bunnell*, 35 F.3d 477, 480 (9th Cir. 1994) (quoting *Mannhalt v. Reed*, 847 F.2d 576, (9th Cir. 1988), *cert. denied*, 488 U.S. 908 (1988)) ("In cases of successive representation, 'conflicts of interests may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.'").

[72] *Perillo v. Johnson*, 205 F.3d 775, 798 (5th Cir. 2000).

[73] *Mickens v. Taylor*, 525 U.S. 162, 175 (2002).

[74] *Id.* at 175 (citing FRCP 44(c)).

[75] 435 U.S. 475 (1978).

[76] *Id.* at 490.

[77] *Id.* at 488.

[78] 446 U.S. 335 (1980).

[79] *Id.* at 348.

[80] *Id.*

[81] 525 U.S. 162 (2002).

[82] *Id.* at 165 ("Saunders did not disclose to the court, his counsel, or petition that he had previously represented Hall.").

[83] *Id.* ("[P]etitioner learned about Saunders' prior representation when a clerk mistakenly produced Hall's file to federal habeas counsel.").

[84] *Id.* at 173-74 ("Since this was not a case in which (as in *Holloway*) counsel protested his inability simultaneously to represent multiple defendants; and since the trial court's failure to make the [*Cuyler*]-mandated inquiry does not reduce the petitioner's burden of proof; it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance.").

[85] *Id.* at 172-173.

[86] *Id.* at 173.

[87] Justice Scalia, writing for the Court, questioned what has become the "expansive application" of *Cuyler* to cases not involving a concurrent active representation case. *Id.* at 175.

[88] ECF Doc. No. 34, at 102-04 (N.T. S. Harmer, Feb. 15, 2019).

[89] *E.g.*, *Chester v. Comm'r of PA Dept. of Corrections*, 598 F. Appx. 94 (2015) (applying *Cuyler* to petitioner's claim trial counsel labored under a conflict of interest because trial counsel had a pending DUI in the trial court where he represented the criminal defendant).

[90] *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

[91] *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988).

[92] *Wood v. Georgia*, 450 U.S. 261 (1981).

[93] *Gambino*, 864 F.2d at 1070 (quoting *United States v. Fahey*, 769 F.2d 829 (1st Cir. 1985)).

[94] *Simon v. Gov't of V.I.*, 929 F.3d 118 (3d Cir. 2019) (quoting *Rivera-Moreno v. Gov't of V.I.*, 61 V.I. 279, 313 (2014)) ("The trial court should conduct a hearing where a habeas applicant 'has made out a *prima facie* case for *habeas corpus* relief that is not procedurally barred[.]'").

[95] ECF Doc. No. 40.

[96] ECF Doc. No. 43.

[97] *Id.* at p. 3 ("We never contended that there was such a direct cause-and-effect, because the law does not require that . . . .").

[98] *McFarland v. Yukins*, 356 F.3d 688, 706 (6th Cir. 2004) ("A defendant or habeas petitioner does not have to produce direct evidence, such as the lawyer's testimony, that the lawyer chose to do one thing rather than another in order to accommodate another client's interests.").

[99] *United States v. Gambino*, 864 F.2d 1064, 1082 n.8 (3d Cir. 1988) (Mansmann, J., dissenting); *see also Perillo v. Johnson*, 205 F.3d 775, 798 (5th Cir. 2000). We note our objective here is not to "enforce the Canons of Legal Ethics," but to understand ethical obligations to apply *Cuyler*'s actual conflict test. Our Court of Appeals, in *Gambino*, adopted a *Cuyler* test requiring our review of an attorney's "inherent conflicts." *Gambino*, 864 F.2d at 1070. To review an attorney's "inherent conflicts" we must understand the attorney's continuing obligation to the former client. We consult canons of legal ethics in this pursuit but do not do so to "enforce" the rules to Attorney Lyden.

[100] 204 Pa. Code Rule 1.9.

[101] *Dougherty v. Philadelphia Newspapers, LLC*, 85 A.3d 1082, 1094 (Pa. Super. 2014).

[102] 204 Pa. Code Rule 1.6.

[103] ECF Doc. No. 43.

[104] ECF Doc. No. 40, at p. 17; *see also id.*, at p. 3 ("[Lancaster County Assistant District Attorney Todd Brown] testified that the District Attorney's office decided that they would offer all three defendants only a plea involving life in prison without parole.").

[105] *Burger v. Kemp*, 483 U.S. 776, 785 (1987) (ruling attorney held no viable alternative to pursue plea when "[t]he notion that the prosecutor would have been receptive to a plea bargain is completely unsupported in the record.").

[106] Even assuming this strategy meets the first *Gambino* test, Judge Rice found Mr. Harmer "fail[ed] to establish that Lyden's prior representation of Cody caused him not to actively pursue a plea agreement for Harmer." ECF Doc. No. 40, at p. 17. We agree. We also find no inherent conflict between pursuing a plea for Mr. Harmer and Attorney Lyden's loyalties to Cody Wunder.

[107] ECF Doc. No. 43, at p. 20.

[108] Even assuming a more vigorously pursued appeal is a "viable alternative strategy," this argument does not satisfy *Gambino*'s second test. As Judge Rice found: "Harmer again fails to establish that Lyden's inactions were motivated by his loyalty to Cody." ECF Doc. No. 40, at p. 21. We agree. We also find Attorney Lyden's continuing duty of confidentiality to Cody Wunder does not inherently conflict with his more vigorous appeal pursuit. Attorney Lyden would be able to actively pursue an appeal for Mr. Harmer notwithstanding a continuing duty of confidentiality to Cody Wunder.

[109] ECF Doc. No. 10, at p. 10.

[110] ECF Doc. No. 40, at pp. 17-18.

[111] *United States v. Morelli*, 169 F.3d 798 (3d Cir. 1999) ("It also concluded that Porotsky's statements were 'so cumulative and peripheral' that impeaching them would have at best made no difference.").

[112] ECF Doc. No. 40, at p. 17.

[113] Even if a more thorough cross examination meets the first *Gambino* test, it cannot meet the second test. Attorney Lyden's continuing duty of confidentiality to Cody Wunder does not inherently conflict with a more thorough cross examination of these witnesses. It is impossible here Attorney Lyden could elicit confidential attorney-client communications between himself and Cody Wunder through questioning a third-party.

[114] ECF Doc. No. 10, at p. 8 (citing *Untied States v. Massimino*, 832 F. Supp. 2d 510, 516 (E.D. Pa. 2011)).

[115] *E.g.*, *United States v. Provenzano*, 620 F.2d 985, 1005 (3d Cir. 1980) (applying presumption to criminal defendant's decision to waive effective representation).

[116] Record, Lancaster County Trial, N.T. C. Wunder, Aug. 8, 2013, at 560-73.

[117] *Id.*

[118] ECF Doc. No. 40, at pp. 19-20.

[119] *Id.* at p. 19.

[120] Record, Lancaster County Trial, N.T. C. Wunder, Aug. 8, 2013, at 560-67.

[121] ECF Doc. No. 40, at pp. 22-29.

[122] 28 U.S.C. § 2253(c)(1).

[123] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

[124] We are unaware of precedent from the Supreme Court or our Court of Appeals where the *habeas* petitioner claims his lawyer labored under an undisclosed conflict of interest based on an earlier representation of a co-defendant in the same case.

[125] 446 U.S. 335 (1980).